DAVID LEAVITT, receiver of the North American Trust and Banking Company, *vs.* MARY ANNA PELL and others.

A married woman may execute a mortgage of her own estate, under a power reserved by her in a marriage settlement executed previous to the marriage.

By a marriage settlement, executed in 1827, the wife, in effect, reserved the right and power to sell and dispose of her real estate included in the settlement as she should think proper, and as if she were a feme sole; and to revoke the uses and trusts contained therein, and to declare new uses and trusts, by deed under the hands and seals of herself and her husband. In 1834, a tripartite indenture was executed by P. the husband, as party of the first part, Mrs. P. of the second part, and S. the trustee of the wife, of the third part, by which—after reciting the seisin of S. in trust for Mrs. P. of certain lands, subject to powers of revocation, and appointment of new trusts, the employment of her separate estate to buy the same, and an agreement to revoke such trusts, and that the same should be held by S. upon the trusts therein after mentioned—the parties of the first and second parts, to carry such agreement into effect, by virtue of all the powers vested in them, revoked all existing uses, estates, trusts, powers and limitations in respect to such lands, other than those thereby intended to be executed, limited and appointed to the use of S. the said premises, upon the trusts therein mentioned; and conveyed the same to him in fee, upon such trusts, to wit: 1. To receive the rents thereof and apply the same to Mrs. P.'s separate use, free from the control, debts or engagements of any husband of hers. 2. After her death, to convey such premises as she should direct by last will and testament, &c., and in default of such appointment, to receive the rents thereof and pay the same to Mr. P. for life. 3. After the death of both Mr. and Mrs. P. and in default of such appointment by her, to her issue, and in default of issue, to her heirs. This instrument also contained this proviso, viz: That Mrs. P. might, notwithstanding her coverture, with the consent of Mr. P. if living, or alone if he were dead, by deed, " *mortgage*, charge or make chargeable, such premises, with and for the payment of any sum and sums of money," &c.

*Held* that this deed or instrument was a disposition and revocation, within the meaning of the marriage settlement of 1827, as to the premises mentioned therein; and that by it, and as a part of such disposition and revocation, Mrs. P. reserved the power to mortgage the said premises, with the consent of her husband. And the husband and wife, and S. the trustee, having subsequently joined in executing a mortgage to the North Am. Trust and Banking Company, it was *further held*, that such mortgage was a proper execution of the power, and was valid; the assent of the husband being shown by his executing the same, and the legal title being covered by S.'s execution thereof.

Where P. applied to the North American Trust and Banking Company, for an issue of stock to him, as a substitute for an original subscriber, and there-

Leavitt *v.* Pell.

upon executed (with others) a mortgage to the company, for the amount of such stock, at its par value; although the market value of the stock did not exceed 98 per cent, at the time the mortgage was delivered and the stock issued, January 4, 1839, and the mortgage was dated, and bore interest from, December 3, 1838, when P.'s application was passed on by the committee; yet it was *held* that no usurious agreement could be inferred from these facts, because there was no *loan.*

Where an action is brought by the receiver of an insolvent banking association, to foreclose a mortgage given by an individual as the substitute for an original subscriber in payment of the subscription of the latter to the capital stock, the defendant cannot set up, as a defense, that the association had no authority to receive the bonds and mortgages from subscribers in payment for the shares of stock issued to them.

ACTION for the foreclosure of mortgages. In the year 1830, the mortgaged premises were conveyed (subject to a mortgage to Abraham Bancker) by Alfred S. Pell and wife to Dudley Selden, Esq., in fee simple, for a pecuniary consideration, by deed bearing date on the 22d October, in that year. They were bought with the separate estate of the defendant, Mrs. Mary Anna Pell, (widow of Ferris Pell, deceased,) as appears by a recital in the deed of trust under which the plaintiff claims the mortgage to the company he represents, was executed, and which is in such mortgage referred to. In 1831, an informal instrument, in the nature of a declaration of trust, was executed by Mr. Selden, bearing date on the 19th of May, in that year; it was in form a bipartite indenture, to which Selden and his wife Augusta M. were parties of the first part, and the defendant, Mrs. Pell, alone, party of the second part; it recited the before mentioned deed from A. S. Pell and wife; that the object of such deed was to vest such premises in Selden, as trustee for the defendant, Mrs. Pell, appointed under an order of the court of chancery, in place of De Witt Clinton deceased, under an ante-nuptial settlement by lease and release, dated on the 2d and 3d of November, 1827, between Mr. and Mrs. Pell, (then Mrs. Sturges,) and Mr. Clinton. By such declaration of trust, the parties of the first part thereto profess to convey the premises in question to Mr. Selden. The habendum clause is "to him, his heirs and

assigns, upon the trusts, terms and conditions, and for the purposes, under, by and for which" the real estate of Mrs. Pell was vested in Mr. Clinton under the recited settlement; Mr. Selden then, in such instrument of trust, "declared" that he should, did and would "hold such premises in the same manner and upon the same trusts, not only as to Mrs. Pell, but also as to *all other parties, persons and heirs,* and also for the same purposes and subject to the same dispositions, power and control, in every respect, as was by such settlement created in Mr. Clinton." Such declaration of trust was *not,* however, executed by Mrs. Selden. The marriage settlement before mentioned, dated in 1827, after reciting the intended marriage between Mr. Ferris Pell and Mrs. (Sturges, now) Pell, the defendant in this suit, conveyed to Mr. Clinton all the real estate of Mrs. Pell *upon trust,* for her sole benefit, "and to permit her to take the rents thereof to her own use, free from the debts and control of her husband, and upon her decease, in trust for her heirs and assigns forever." It also contained a proviso empowering Mrs. Pell, by and under her hand and seal, as if she were a *feme sole, First.* To sell and dispose of the premises as she should think proper. *Second.* To devise and dispose of the same among her children with the approbation of Mr. Pell, in writing, under his hand and seal, *or* to him. *Third.* To agree to a partition of any lands held jointly. Such settlement also contained a power of revoking the uses contained therein, and declaring new uses, by deed under the hands and seals of Mr. and Mrs. Pell, acknowledged so as to be capable of being recorded. In 1834 a tripartite indenture was executed by Mr. Pell, as party of the first, Mrs. Pell of the second and Mr. Selden of the third part, dated on the 11th of March of that year, and relating to such premises. This was both a deed and declaration of trust; after reciting therein, the seisin by Mr. Selden *in trust* for Mrs. Pell, subject to powers of revocation and appointment of new trusts, the employment of her separate estate to buy the same and an agreement to revoke such trusts

and that the same should be held by the party of the third part upon the trusts thereinafter mentioned, by such deed of trust the parties thereto of the first and second parts to carry such agreement into effect, by virtue of all the powers vested in them, revoked all existing uses, estates, trusts, powers and limitations in respect to such premises in question, other than those thereby intended to be executed, limited and appointed to the use of the party of the third part, the premises in question, upon the trusts therein mentioned, and conveyed the same to him in fee, upon such trusts, to wit: 1st. To receive the rents thereof and apply the same to Mrs. Pell's separate use, *free from the control, debts or engagements of any husband of hers.* 2d. After his death to convey such premises as she should direct by last will and testament, &c., even if made without consent of her husband, and in default of such appointment to receive the rents thereof, and pay the same to Mr. Pell for life. 3d. After the death of both Mr. and Mrs. Pell, and in default of such appointment by her, to her issue (taking *per stirpes,*) and in default of issue to her heirs. Such deed of trust also contained five *provisos,* viz: 1st. That Mrs. Pell might, notwithstanding her coverture, *with the consent of Mr. Pell,* if living, or alone, if he were dead, by deed, *"mortgage, charge or make chargeable such premises with and for the payment of any sum and sums of money to be paid and payable at any time or times to any person or persons."* 2d. That the trustee might, with the consent of Mr. and Mrs. Pell, during his life and of her alone, after his death, "grant, sell and convey the premises in question." 3d. That Mrs. Pell might *with the consent of Mr. Pell,* revoke the trusts, uses, powers and provisos contained in such deed, and declare new ones. 4th. That Mr. and Mrs. Pell, and their survivor might appoint new trustees in place of Mr. Selden. 5th. That Mr. Selden might on one month's notice, surrender the trust to a new trustee. Four lots, part of the premises in question, were at the time of the conveyance thereof, in October, 1830, to Mr. Selden by A. S. Pell and wife, subject

to a mortgage, dated on the 6th of April, previously executed to Abraham Bancker, to secure a bond of the same date, executed by Ferris Pell, conditioned to pay two thousand dollars with interest; which mortgage remained outstanding until about the 4th of January, 1839. In July, 1838, a banking association was formed in the city of New York, and its certificate filed pursuant to the 15th section of the statute authorizing banking, by the name of "The North American Trust and Banking Company," the president of which, until October, 1840, was Joseph D. Beers; such company received subscriptions to their capital stock, for which they received bonds and mortgages from the subscribers; among such subscribers was Thomas L. Servoss, to whom certificates for one thousand shares so subscribed for were issued. In December, 1838, Ferris Pell (the husband of the defendant, Mrs. Pell,) made an application to such banking company, upon which, on the 4th of January, 1839, one hundred and fifty shares of the stock so issued to Mr. Servoss, were transferred by the latter by his attorney in fact Mr. Tylee, (the secretary of the company,) to Mr. Pell, whereupon the latter executed his bond, bearing date the 20th day of December previous, to Mr. Beers, (as president of such company,) in the penal sum of $30,000, conditioned to pay $15,000 in one year from the date thereof, with legal interest, to be paid half-yearly on the first days of May and November in each year, until the principal was paid. The market value of the stock so delivered, at the time of its transfer, was $14,700. Simultaneously with the execution of such bond, a tripartite indenture of mortgage of the premises in question, of the same date, was executed to Mr. Beers as such president, to which Mr. and Mrs. Pell were parties of the first part, and Mr. Selden, party of the second part; whereby, after reciting the marriage settlement of 1827 of Mrs. Pell, together with its contents, the death of Mr. Clinton and proceedings taken to appoint Mr. Selden his successor, the conveyance, in 1830, from A. S. Pell and wife to Mr. Selden, the declaration of trust of 1831, executed by Sel-

den alone, together with its contents, Mrs. Pell, *with her hus-band's consent,* testified by his execution thereof, and Mr. Selden with *the like consent* of Mr. and Mrs. Pell, for securing the payment of the money mentioned in the condition of the bond, and in consideration of one dollar paid to Mrs. Pell, conveyed the premises in question to Mr. Beers, as president as aforesaid, in fee, subject to a defeasance in case the amount secured by such bond should be paid. Mr. Pell, in and by the same instrument, for one dollar paid to him, confirmed it. There were also in such instrument the following covenants by Mr. and Mrs. Pell: 1. That Mrs. Pell had not, since the deed of trust of 1834, charged the lands. 2. That she had not revoked, &c. any of the trusts of said deed, or limited new ones, or appointed a new trustee. 3. That neither of them had, by virtue of any power contained in such deed, aliened or encumbered the premises, or consented to any thing whereby the title to the same could be changed, or the security of that mortgage defeated. 4. That they would pay the amount due on the mortgage. This instrument, also, con-tained a power of sale; a clause authorizing insurances to be made by Mr. Beers, for the premiums on which such mort-gage should be a security, and a final clause authorizing the payment of any part of the principal on the days of paying interest. This indenture of mortgage was not recorded until the 3d of January, 1839.

Abraham Bancker died before January, 1839, leaving his last will and testament, wherein Evert A. Bancker was ap-pointed executor thereof; on the 4th day of that month Mr. Pell delivered to such executor 20 of the 150 shares received by him on the execution of such mortgage last mentioned, and agreed also to make up the difference between the price of the stock and the amount of the bond held by Mr. Bancker, being about $300, in consideration whereof such executor transferred to Mr. Beers, as president, &c. the mortgage made to Abraham Bancker, with the bond mentioned therein, as *a collateral security* for the payment of the indebtedness of Mr. Pell to

such company, and as a protection to the title to the premises in question. In November, 1849, (prior to which time Mr. Pell had died,) Mr. Selden conveyed the premises in question to Mrs. Pell, to hold as her separate estate. In 1839, on the 13th of November, a bill was filed in the court of chancery of this state, before the chancellor, in the name of Mr. Beers, by the name of the president, &c. to foreclose the mortgage for $15,000, upon the premises in question, against Mr. and Mrs. Pell, Mr. Selden, and other persons claiming interests thereon ; which bill was taken as confessed by all the defendants, except Mr. and Mrs. Pell, who put in their answer thereto ; nine days after filing such bill, (22d November, 1849,) Mr. Beers assigned the said mortgage to Samuel F. McCracken, Daniel Kilgore and Joseph S. Lake, commissioners of the canal fund of the state of Ohio ; in 1840, (on the first of December,) Thomas G. Talmage having been appointed president of such company, in place of Mr. Beers, was by an order of court substituted as complainant in such suit, in his stead ; in 1841, (on the 20th September,) the present plaintiff was appointed receiver of the North American Trust and Banking Company. In 1842, (on the 19th of March,) Messrs. J. S. Lake, Alfred Kelly and Noah H. Swayne, having become commissioners of such canal fund, in place of Messrs. McCracken, Kilgore and Lake, obtained an order of court allowing them to file an original bill in the nature of a supplemental bill, in the suit then so pending in the name of Mr. Talmage, for the foreclosure of said mortgage. Messrs. Lake, Kelly and Swayne filed a bill in pursuance of such order, against the defendant in the original suit, and Mr. Leavitt as such receiver, in which, after reciting the contents of the original bill, the assignments to their predecessors of the mortgage in question, their own succession to office, the consideration paid by such predecessors for such and other mortgages, they prayed they might have the full benefit of all the proceedings in the original suit, and that the mortgage of Mr. and Mrs. Pell for $15,000 might be foreclosed. To that

bill answers were filed by Mr. and Mrs. Pell, and Mr. Leavitt, and replications having been filed thereto, proofs were taken in the original and supplemental suits jointly, and such proceedings were had that the same were brought to a hearing jointly before the supreme court in equity, on the 26th day of December, 1849, and a decree on the merits in both suits made, ordering a reference to compute the amount due on such mortgage, and a sale of the premises to satisfy the same, and decreeing a foreclosure against the defendants in such suits. From that decree Mr. and Mrs. Pell and Leavitt appealed in both suits to the court of appeals, and such appeal having been heard, it was by the court of appeals adjudged that such decree of the supreme court be reversed and annulled, and the original and supplemental bill be dismissed without prejudice to the right of the state of Ohio, under certain agreements mentioned in the pleadings; that judgment was remitted to the supreme court, and was made its decree in 1852, (on the 10th of November.)

The complaint in this action was filed in 1854, to which the defendant Mrs. Pell put in two answers, one in her own right, and one as executrix of her deceased husband's last will and testament, and answers were put in for the infant defendants, (children of Mr. and Mrs. Pell,) and also for other defendants.

The issues in this action were tried before Judge ROOSEVELT, without a jury, on the 4th and 5th of December, 1856; upon such trial the pleadings, proceedings and proofs in the original and supplemental suit before mentioned were read, also various orders relative to the appointment of the plaintiff as receiver; also, the deeds before mentioned affecting the premises in question. Whereupon the judge presiding found various facts in such action, and upon those facts found, as a conclusion of law, among other things, that the company had power to issue said one hundred and fifty shares of stock for the bonds and mortgages of Pell, mentioned in the complaint; that Mr. and Mrs. Pell, and her

trustee, had power to make and execute the mortgage in ques-
tion, so as to bind the lands described therein, and that the
plaintiff as such receiver as aforesaid, was entitled to the usual
judgment for the foreclosure and sale of the mortgaged premises
described in the two mortgages set forth in the complaint, and
for his costs, and an allowance. To which findings of fact
and conclusions of law, various exceptions were duly filed in
behalf of the defendant, Mrs. Pell, and the guardian for her
infant children. Judgment being entered in favor of the
plaintiff, Mrs. Pell and the guardian for her infant children
appealed to the general term.

*Geo. N. Titus* and *Wm. Curtis Noyes,* for the plaintiff.

*A. L. Robertson,* for the defendant Mrs. Pell.

*Walter Rutherfurd,* for the guardian *ad litem* of infant
defendants.

*By the Court,* SUTHERLAND, J. As to the objection of the
defendant, Mary Anna Pell, and of the guardian *ad litem* of
her infant children, to the mortgage executed by her, her
husband, Ferris Pell, and Dudley Selden to Mr. Beers, as
president of the "North American Banking and Trust Com-
pany," that they had no power or authority to execute the
same, so as to bind the lands described therein, I think the
question is precisely the same as if the mortgaged premises
had been a portion of the real estate of Mrs. Pell conveyed
by her to Mr. Clinton in trust, by the marriage settlement of
1827, made in anticipation of her marriage with Ferris Pell,
and by such marriage settlement papers she had expressly re-
served the same right and power to mortgage the premises in
question that she did in and by the deed or instrument exe-
cuted between her, her husband Ferris Pell, and her trustee,
Dudley Selden, in 1834, by which she revoked the trusts
upon which Selden then held the premises in question, and

Leavitt *v.* Pell.

declared the new trusts upon which he should thereafter hold them, and expressly reserved the power to mortgage, with the consent of her husband if living, or alone if he were dead, " for the payment of any sum and sums of money, to be paid at any time or times, to any person or persons."

The premises in question were purchased with her money, after her marriage with Ferris Pell, and conveyed to Dudley Selden, her trustee, who had been appointed such trustee by the court of chancery in the place of De Witt Clinton, after the death of the latter; and were at the time of the execution of the deed between her, her husband and Selden, in 1834, held by Selden upon the same trusts and subject to the same right and power of revocation and disposition as a feme sole which she had declared and reserved in and by the marriage settlement of 1827.

By the marriage settlement in 1827, Mrs. Pell in effect reserved the right and power to sell and dispose of her real estate included in the settlement as she should think proper, and as if she were a feme sole, and to revoke the uses and trusts contained therein, and to declare new uses and trusts by deed under the hands and seals of herself and husband.

The deed or instrument executed by and between herself, her husband and Selden, in 1834, *was a disposition and revocation within the meaning of the marriage settlement of* 1827, *as to the premises in question;* and by it, and as part of such disposition and revocation, she reserved the power to mortgage the premises in question, with the consent of her husband. His consent is shown by his execution of the mortgage, and the legal title is covered by Selden's execution. As to the *power,* therefore, of Mrs. Pell and her husband and Selden to execute the mortgage, so as to bind her estate in the lands, the only question there can be is this : Can a married woman execute a mortgage of her own estate, under a power reserved by her before her marriage, and while she was a feme sole ?

If the trust deeds under which the property mortgaged was held for Mrs. Pell's benefit, would not, previous to the revised statutes, have authorized the execution of the power by her, on account of the common law disability of coverture, yet it has been held in *Wright* v. *Tallmadge,* (15 *N. Y. Rep.* 307,) that section 110 of the article in the revised statutes relating to powers, (1 *R. S.* 735,) has completely removed the disability of coverture in respect to the execution of powers. I think in the execution of the mortgage in question, the power was well executed and so as to pass her interest in the land. If Mrs. Pell's children had any vested rights under the trust deeds, such rights vested *subject* to the execution of the power. In protecting married women in the exercise of powers over their own property, reserved before marriage, the statute and the court do protect the rights of married women.

It is also insisted in behalf of Mrs. Pell and her children, that the $15,000 mortgage is void for usury. The "North American Trust and Banking Company" was an association of certain persons, named in the complaint in this action, organized in July, 1838, under the general banking act, passed in April, 1838. The capital stock of the association was two millions, divided into twenty thousand shares of $100 each, with power to increase the same to fifty millions, as provided in the articles of association. There were twenty orignal subscribers for one thousand shares of stock, each. Thomas L. Servoss was one of the original subscribers. It appears from the deposition of Servoss, and from other proofs in this case, that when he subscribed for his one thousand shares, he subscribed upon the express understanding, with the other subscribers, that he was not to be bound absolutely to take the shares, or to pay or to secure the payment of his subscription, but that the stock for which he subscribed, and then standing in his name on the books of the company, should be issued by the company to parties afterwards offering bonds and mortgages for stock—that accordingly he afterwards transferred eight

hundred shares of his original subscription to a Mr. Burckle, without consideration; to whom the company issued certificates for the same bonds and mortgages, and afterwards gave Mr. Tylee, (2d cashier,) a power of attorney to transfer to Ferris Pell 150 additional shares; which was transferred to Pell on the books of the company the same day; and certificates for the same were issued to Pell by the company for his bond, and the mortgage for $15,000 in question.

The other original subscriptions for stock, or many of them, it would appear, were made upon the same terms, and were followed by similar transfers and issues of stock for bonds and mortgages. Indeed, it would appear from the proofs in this case, that this company was one of those John Law magnificent schemes of substituting credit for capital, which every now and then rises up with fascinating brilliancy, and fastens itself on the eye of the public, and soon ends by depleting their pockets and patience for the benefit of lawyers, and their managers.

It is true the entry on the books of the company is, that Ferris Pell, Dec. 3d, 1838, applied for a *loan* of $20,000; but it also appears from the same entry, that his application was approved for $15,000 of *stock;* and the stock was issued to him the 4th January, 1839, on the fictitious transfer by Tylee of the 150 shares, and the delivery of the bond and mortgage for $15,000. It is very clear that in entering these applications for *stock* for bonds and mortgages, as applications for *loans*, the officers of the company merely adopted a figure of speech, calculated to carry out the flattering idea that the original subscription of two millions of capital had been actually *bona fide* subscribed for and paid in, or secured; and thus calculated to satisfy their own consciences, the public and the law, at the same time. But, poetry aside, the fact is, Ferris Pell's application was for *stock* to be issued by the company for his bond; and the mortgage for $15,000, executed by his wife, himself and Selden, was executed to secure the payment of the bond. The application was not for a

*loan,* either of stock or money, but for an *issue* of stock to him as a substitute for an original subscriber. Although the market value of the stock did not exceed 98 per cent when the mortgage, &c. was delivered and stock issued, January 4, 1839, and the mortgage is dated, and bears interest from, December 3d, 1838, when Pell's application was passed on by the committee, yet no usurious agreement can be inferred from these facts, because there was no loan.

It is also insisted that the fact found by the judge at special term, that the company had power to issue the 150 shares of stock for the bonds and mortgages of Pell, is contrary to evidence; that they could only loan money upon real security, and had no power to issue stock for bonds and mortgages.

Were this action brought by the company, for its own benefit, and not by the receiver for the benefit of creditors and third parties, as it appears to be, I should certainly look at the authorities very closely, before I should say that the organization of the company was regular, and its mode of getting the mortgage in question, and other mortgages, and of going into operation, legitimate and authorized; and that Mrs. Pell was estopped from setting up any such irregularity or want of authority. From the articles of association and the proofs, it certainly does appear that the whole scheme was to make the payment of the whole capital in bonds and mortgages operate as an investment of the whole capital, and thus make short work of it. The capital was to be paid in bonds and mortgages, and then these bonds and mortgages were to be pledged to raise money *to loan* and operate with. But as the company has been decreed to be insolvent, and unable to pay its debts, and this suit is brought for the benefit of creditors and innocent third parties, Pell himself, as the substitute for an original subscriber, could not set up any irregularity or want of authority in the mode of procuring the bond and mortgage, and Mrs. Pell cannot be, as I can see, in any better position. (*Sagory* v. *Du Bois,* 3 *Sandf. Ch. R.* 466. *Palmer* v. *Lawrence,* 3 *Sandf. S. C. R.* 161.

*S. C.* 1 *Selden,* 389. *McFarlan* v. *Triton Insurance Co.,* 4 *Denio,* 392.)

It is also insisted that the matter in controversy is *res adjudicata.* I think not. There was no adjudication in the court of appeals, on the merits, upon the appeal from the decree of the supreme court; but the decree of the supreme court was reversed, and both the original and supplemental bills were *dismissed* by the court of appeals, on the ground that the assignment of the bonds and mortgages to the commissioners, &c. of Ohio by the company was illegal and unauthorized. The court of appeals did not pass upon the merits, and there is no judgment of the supreme court on the merits.

Although the Bancker bond and mortgage was paid, as between Pell and Bancker's executor, yet I do not see why it was not properly assigned to the company for the protection of the title, &c. It was expressly agreed by Pell that it should be so assigned, and the plaintiff only claims the amount due on the $15,000 mortgage.

The judgment of the special term must be affirmed, with costs.

[NEW YORK GENERAL TERM, May 3, 1858. *Davies, Clerke* and *Sutherland,* Justices.]